UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5-4-10
```

-----------------------------------X

TODD EBERHARD,

                    Petitioner,                    09 Civ. 110

        -against-                                   OPINION

UNITED STATES OF AMERICA,

                    Respondent.

-----------------------------------X

A P P E A R A N C E S :


            Attorney for Petitioner

            DAVID WIKSTROM, ESQ.
            26 Broadway, 19th Floor
            New York, NY 10004

            Attorney for Respondent

            PREET BHARARA
            United States Attorney
            Southern District of New York
            86 Chambers Street
            New York, NY  10007
            By:  Jonathan R. Streeter, Esq.

**Sweet, D.J.**

Petitioner Todd Eberhard ("Eberhard" or the "Petitioner") has moved under 28 U.S.C. § 2255 to vacate his sentence on the grounds that his counsel was ineffective.  Based on the facts and conclusions set forth below, his motion is denied.

**Prior Proceedings**

On September 14, 2004, Eberhard pled guilty, pursuant to a plea agreement with the Government, to one count of conspiracy to commit investment advisor fraud, wire fraud and mail fraud, seven counts of investment advisor fraud, one count of wire fraud, one count of mail fraud, and one count of obstruction of justice in connection with a Securities and Exchange Commission ("SEC") proceeding before the Honorable Richard M. Berman. (A. 59-78.)[1]  In the plea agreement, the parties stipulated that Defendant had an offense level of thirty and a criminal history category of I under the November 1, 2002 United States Sentencing Guidelines ("U.S.S.G."), resulting

---

[1]     "A." refers to the appendix filed by Eberhard in his direct appeal to the Second Circuit.  "SA" refers to the Supplemental Appendix filed by the Government in that appeal.

1

in a stipulated guidelines range of 97-121 months'
imprisonment.  (A. 56.)[2]  This calculation did not include a
four-level enhancement for Eberhard's leadership role in
extensive criminal activity, pursuant to U.S.S.G.
§ 3B1.1(a).

The plea agreement provided that neither the
United States Probation Office ("Probation Office") nor the
Court were bound by the parties' stipulation regarding
questions of fact or the proper guidelines calculation, and
that the parties reserved the right to answer any inquiries
and make all appropriate arguments concerning any
departures from the guidelines adjustments or calculations
set forth in the agreement.  The agreement also provided
that Defendant could not withdraw his guilty plea should
the Court impose a sentence outside the guidelines range
set forth in the agreement.  (A. 56.)

---

[2]     The parties stipulated to a base offense level of six pursuant to
U.S.S.G. § 2B1.1(a); a twenty level increase because the loss was
between $7 million and $20 million pursuant to U.S.S.G.
§ 2B1.1(b)(1)(K); a two level increase because the offense involved
more than ten victims pursuant to U.S.S.G. § 2B1.1(b)(2)(A); a two
level increase because Defendant abused a position of trust and/or used
a special skill pursuant to U.S.S.G. § 3B1.3; a two level increase
because Defendant obstructed justice in connection with the offense
pursuant to U.S.S.G. § 3C1.1; and a two level decrease because
Defendant accepted responsibility pursuant to U.S.S.G. § 3E1.1(a).  (A.
55.)  The parties further stipulated that an additional one-level
decrease in offense level was not appropriate because Eberhard did not
give timely notification of his intention to plead guilty pursuant to
U.S.S.G. § 3E1.1(b).  Id.

In a Presentence Investigation Report ("PSR") prepared in advance of Eberhard's sentencing, the Probation Office adopted the plea agreement guidelines calculation, but also recommended a four-level leadership role enhancement, pursuant to U.S.S.G. § 3B1.1(a).  (PSR ¶¶ 67-81.)  The Probation Office concluded that, "[b]y virtue of Eberhard's founding and ownership of his companies, EIA and Park South Securities, Eberhard is viewed as the leader and/or organizer of this fraudulent scheme, as he orchestrated, carried out, and directed his employees to commit acts in furtherance of the fraudulent scheme," (PSR ¶ 59), and that, "Eberhard devised the entire scheme and directed his employees to commit acts in furtherance of the fraudulent scheme" (PSR ¶ 74).  As a result, the Probation Office calculated an offense level of 34 and a guidelines range of 151-188 months' imprisonment.  (PSR ¶ 118.)

Prior to Eberhard's sentencing, the Government provided notice of the sentencing proceeding to the victims of the offense, pursuant to 18 U.S.C. § 3771(a).  (A. 216, 218.)  The Government received five letters discussing the impact of Eberhard's conduct — from four victims and one lawyer who represented two of those victims — and promptly

3

forwarded the letters to Carl Bernstein ("Bernstein"),
Eberhard's sentencing counsel, prior to sentencing. (SA 2-
14.) See United States v. Eberhard, 525 F.3d 175, 178 n.1
(2d Cir. 2008) (noting that the Government disclosed all
victim impact letters in this matter to the defense in
advance of sentencing). Prior to sentencing, the
Government also received letters describing, among other
things, Eberhard's efforts to impede the work of the
receiver appointed to liquidate Eberhard's assets in
connection with the SEC proceeding (SA 15-17), the broad
extent of Eberhard's offenses, including repeated lies and
fraudulent acts (SA 18-21), and details of the
$9,967,969.96 that Eberhard had misappropriated from
customer accounts. (A. 115; SA 22-25.) Bernstein was
copied on these letters. (SA 15-25.)

        Bernstein submitted a substantial pre-sentence
memorandum, arguing that the Court should consider
Eberhard's full acceptance of responsibility, his
assistance to the court-appointed receiver in recouping
assets for his victims, his difficulty during childhood
(including the early death of his father and a learning
disability), his initial success in building a business
despite those difficulties, the care he provided to his

4

family, and the letters in support of Eberhard, among other
things, in sentencing him.   (A. 88-111.)

On June 7, 2005, the day of Eberhard's
sentencing, a written sentencing opinion was filed.   (See
Sentencing Op., dated June 7, 2005.)   The sentencing
opinion stated that pursuant to United States v. Booker,
543 U.S. 220 (2005), and United States v. Crosby, 397 F.3d
103 (2d Cir. 2005), the sentence would be determined
"through consideration of all the factors identified in 18
U.S.C. § 3553(a), including the advisory Sentencing
Guidelines."   (A. 168.)   The sentencing opinion adopted the
facts and guidelines calculation in the PSR, and stated
that although the plea agreement did not include an
adjustment for Eberhard's leadership role, a four-level
enhancement pursuant to U.S.S.G. § 3B1.1(a) would be
imposed for the reasons set forth in the PSR.   (A. 174.)

At the sentencing proceeding held later that day,
three of the victims who had submitted letters and two
lawyers representing victims requested that the Court
impose the maximum sentence allowed by law.   (A. 123, 127,
132.)   Another individual, who claimed to have worked for

Eberhard, maintained his database, and personally observed Eberhard's fraud, also addressed the Court.  (A. 146-48.)

Bernstein expanded on the arguments for leniency in his written submission, including Eberhard's efforts to return money to the victims, his exceptional remorse, the low likelihood of recidivism, and his devotion to his family.  (A. 135-41.)  He did not challenge the four-level leadership role enhancement in the PSR and the Court's sentencing opinion.  (A. 134-41, 153.)  The Government noted that imposing the enhancement required the Court to find either that the criminal activity involved five or more participants or was otherwise extensive.  (A. 145-146).  This Court stated that the fraud was "extensive" and that Eberhard "enlisted his employees, and there were more than five.  There were a substantial number who were involved in this scheme.  When I say involved in the scheme, I mean directed by Eberhard to take some of the actions that resulted in the scheme and in the fraudulent scheme."  (A. 150-51.)

The Court stated that it intended to sentence toward the bottom end of that range to give Eberhard the opportunity to get out of jail earlier and begin making

restitution (A. 149-51) and that the sentencing opinion was modified based upon the sentencing proceeding. Eberhard was sentenced to 160 months' imprisonment, an increase of nine months over the written sentencing determination, but still below the middle of the Guideline range. (A. 135, 151-52.) The Court adopted the remainder of its sentencing opinion (A. 152, 176), and subsequently ordered Eberhard to pay $19,870,412.66 — an amount agreed upon by the parties — in restitution. (A. 196.)

Eberhard moved for reconsideration of the sentence pursuant to Fed. R. Crim. P. Rules 33 and 35 and argued for the first time in that motion that the Court erred in finding he was subject to a four-level leadership role enhancement. (A. 157-65.) The motion was denied, because Rules 33 and 35 did not confer authority to reconsider Eberhard's sentence (A. 181-85), the record supported the Court's finding that Eberhard was an organizer or leader of criminal activity involving five or more participants, and the criminal activity was otherwise extensive (A. 189-95). With respect to the number of participants, the PSR listed at least four conspirators and, including the former Eberhard employee who spoke at his sentencing and admitted knowledge of the fraud, the

7

record reflected at least five co-conspirators.  (A. 191-
192; PSR ¶¶ 34, 38.)  The fraud was also "otherwise
extensive" under U.S.S.G. § 3B1.1(a) because Eberhard had
30 employees, directed his employees in "every component of
that criminal activity, from the processing of churned
sales to the extensive cover-up operations," and paid
exorbitant salaries to induce his employee's silence.  (A.
194.)

        Eberhard appealed his sentence, arguing that
application of the Victim Rights Act to his sentencing was
unconstitutional under the Ex Post Facto and Due Process
clauses of the Constitution.  He also claimed that the
four-level leadership role enhancement was not supported by
the record and challenged the reasonableness of his
sentence.  The Second Circuit rejected these claims and
affirmed the judgment of this Court, finding no
constitutional violation, that Eberhard had waived his
challenge to the four-level enhancement, and that the
sentence was substantively reasonable.  Eberhard, 525 F.3d
at 178-79.

**The Facts**

From 1993 through May 2003, Eberhard, who ran
several businesses providing investment advice and
management services to individual investors, engaged in a
scheme to defraud his clients. As part of that scheme,
Eberhard, along with his co-conspirators, improperly
churned client accounts to generate millions of dollars in
commissions and compensation for himself and his firms, and
misappropriated millions of dollars through unauthorized
withdrawals and transfers from client accounts.  (A. 170.)
Eberhard used the proceeds of his fraud for his personal
benefit, to pay employees exorbitant salaries to
participate in the scheme, to settle claims with former
clients who had complained about his fraud, and to make
extortion payments to co-conspirators who threatened to
report his illegal conduct.  To conceal his fraud from
clients, Eberhard and his employees issued fabricated and
fraudulently-altered account statements to clients and lied
to clients about their account balances and trading
activity in their accounts.  (PSR ¶ 19.)

Throughout the scheme, Eberhard held Series 7,
24, 63 and 65 licenses with the National Association of

Securities Dealers ("NASD").  He was the president of
Eberhard Investment Associates and its predecessor entity,
Eberhard Investment Advisers (collectively "EIA"), though
which he purported to render investment advice to clients.
He was a general securities principal and representative at
Clearing Services of America, a securities broker-dealer
registered with the SEC, and a member of the NASD that was
authorized to trade securities.  Eberhard was also the
Chairman of the Board and part owner of Park South
Securities ("Park South"), an investment adviser firm and
broker-dealer registered with the SEC.  In addition,
Eberhard was the Chief Executive Officer and owner of
Powell Transactions ("Powell"), an entity through which he
conducted certain of his personal financial transactions,
including the purchase of real estate.  (A. 169-170.)  By
1999, EIA and Park South, entities controlled by Eberhard,
employed approximately 30 people.  (A. 98, 193.)

During the course of the scheme, Eberhard
"churned" investor accounts by engaging in excessive
trading designed solely to generate commissions for
Eberhard.  In some instances, clients had knowingly
provided Eberhard with discretionary trading authority,
permitting him to conduct trades without their prior

10

approval. In other instances, however, Eberhard forged client signatures on forms granting him such discretion, or simply exercised discretion without any client authority, in violation of the rules of the registered broker-dealers through which he conducted trades. As Eberhard's client base and financial obligations — including repaying clients he had previously defrauded — increased, Eberhard's churning became more extensive. (A. 170-171.) Over the ten year scheme, Eberhard's churning caused at least approximately $10 million in losses to his victims. (A. 115-16; 144; 196-200.)

In addition to churning, Eberhard misappropriated money directly from his clients' accounts by transferring funds into accounts in which he had a beneficial interest or into other client accounts with shortfalls caused by his churning or theft. (A. 171.) Eberhard accomplished this by directing his employees to forge client signatures on letters authorizing the transfers, preparing and directing his employees to prepare fraudulent bills for management fees, and forging client letters authorizing payment of management fees to Powell. (PSR ¶¶ 130-31.) Eberhard misappropriated at least $9,967,696.96 from client accounts

11

over the course of the scheme.   (A. 115, 144, 196-200; SA
22-25.)

        Eberhard used the proceeds of his fraud to, among
other things, purchase real estate in Manhattan for himself
and his family, purchase or lease expensive vehicles,
maintain a chauffeured car for personal use, and make
personal real-estate investments across the U.S. and
abroad, including the purchase of an island in Nova Scotia,
Canada.   (PSR ¶ 33.)  He also used the proceeds of his
fraud to pay exorbitant salaries to his employees who
participated in the fraud.  (A. 171.)  In addition,
Eberhard used the proceeds of his fraud to pay settlements
to clients who discovered his fraudulent conduct and
confronted him and to persuade them not to notify the
authorities of his conduct or otherwise publicize the
settlements.   Though he knew the NASD required him to
report these settlements, Eberhard failed to do so.  From
1999 through 2003, Eberhard entered into agreements to make
payments to clients totaling in excess of approximately
$4.5 million.  (A. 171-72.)

        Eberhard also used the proceeds to make extortion
payments to two co-conspirators — one former employee and

12

one then-current employee of EIA — to prevent them from disclosing his criminal activities to law enforcement and his marital infidelities to his wife. (A. 172, 191.) From January 2002 through February 2003, Eberhard paid these individuals approximately $1.55 million in "hush money." (PSR ¶ 38; A. 193.)

To prevent his EIA clients from discovering his fraudulent activity, Eberhard and employees acting at his direction made a series of misrepresentations including, for example, generating account statements on EIA letterhead that falsely inflated the value of client accounts, pasting client names onto account statements of other clients with higher account balances, and changing clients' addresses of record to Eberhard's or another EIA employee's residence so the actual investor would not receive account statements showing depleted balances or losses. (A. 172.) When clients received accurate account statements or trading records, Eberhard lied to them to hide his fraud. For example, Eberhard hid his churning activity from clients who received an inordinate number of trade confirmations by telling them the trades had been cancelled, when in fact they had not. He told clients who received account statements showing depleted balances that

their money was invested elsewhere or that the statements did not include "trades not settled." He told clients that unauthorized transfers were mistakes, when in fact he had directed those transfers. (PSR ¶¶ 41-44).

In February 2003, the SEC sued Eberhard and his affiliated entities and obtained a temporary restraining order. In that action, Judge Berman ordered Eberhard to provide a list of all assets belonging to him and his affiliated entities and further ordered all such assets frozen, to preserve them for distribution to victims of his fraud. Eberhard responded by engaging in obstruction of justice to undermine Judge Berman's order and shield certain of his assets from the freeze order. In 2003, he created a fraudulent document that purported to show that in April 2000 he had transferred his interest in certain property to his sister and two former clients. He then directed family members and two former clients to sign the document, which falsely purported to be executed and notarized in April 2000, and file the document with the Court and a receiver appointed by Judge Berman to liquidate his assets. Eberhard also filed the fraudulent document with the SEC. (A. 172-73; PSR ¶¶ 51-55.)

14

## The Applicable Standard

A defendant seeking to attack his conviction based on the allegedly ineffective assistance of counsel must (a) show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (b) "affirmatively prove prejudice," i.e., demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-89, 693-94 (1984); see Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

In analyzing a claim that trial counsel's performance fell short of constitutional standards, a "court 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' bearing in mind that 'there are countless ways to provide effective assistance in any given case' and that 'even the best criminal defense attorneys would not defend a particular client in the same way.'" United States v. Aguirre, 912 F.2d 555, 560 (2d Cir. 1990) (quoting Strickland, 486 U.S. at 689). Thus, under

15

Strickland, "[an attorney's] strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." Mayo, 13 F.3d at 533 (quoting Strickland, 466 U.S. at 690); see United States v. Jones, 918 F.2d 9, 11-12 (2d Cir. 1990).

Even if an attorney's performance was objectively unreasonable and unprofessional, the defendant must also prove prejudice. The defendant must show and the reviewing court must assess "whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different." Mayo, 13 F.3d at 534. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694).

16

"[T]he 'prejudice' component of the Strickland test . . . focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993); see Bunkley v. Meachum, 68 F.3d 1518, 1522-23 (2d Cir. 1995).

In his motion, Eberhard has claimed that his sentencing counsel was ineffective because counsel failed: 1) to file objections to the guidelines calculation; 2) to become aware, prior to the sentence, of this Court's sentencing opinion which adopted that guidelines calculation; 3) to object to this Court's adoption of that calculation; 4) to seek an evidentiary hearing on the guidelines calculation; 5) to defend against the victim statements; and 6) to research and argue to this Court precedent on the impact of negotiated guidelines agreements or sentences imposed in similar cases. (Eberhard Br. 2-3.) As set forth below, these claims fail to meet the standard for establishing that Eberhard's counsel was ineffective.

17

## **The Conduct of Counsel upon Sentencing Was Reasonable**

Eberhard has contended that his counsel provided ineffective assistance by failing to learn promptly of this Court's sentencing opinion so that he could respond to it in a timely manner.  In his Section 2255 petition, Eberhard suggested that Bernstein became aware of the sentencing opinion several hours prior to sentencing because of his failure to monitor the docket or access the electronic case filing system.  (Eberhard Pet. ¶ 17.)  However, the sentencing opinion was only issued to the parties hours prior to the sentencing.  Accordingly, counsel did not provide ineffective assistance because he learned of that opinion promptly upon its issuance.

In addition, Eberhard has contended that failure to give advance notice of the Court's sentencing intentions is plain error.  (See Eberhard Pet. ¶ 17.)  Eberhard cited the body of law requiring a court to give advance notice of its intention to depart from the sentencing guidelines range on a basis not identified in the PSR.  See Fed. R. Crim. P. Rule 32(h) and 32(i)(l)(C).  However, as Eberhard acknowledges, the guidelines calculation of which he

complains was identified in the PSR.   Accordingly,
Counsel's conduct was entirely reasonable.

## **Eberhard Has Not Established Prejudice**
## **Arising from Counsel's Conduct at Sentencing**

Eberhard claims that his counsel was ineffective
because he failed to object to the PSR or the sentencing
opinion and he failed to demand an evidentiary hearing
concerning the four-level leadership role enhancement.
Regardless of whether counsel's failure to object fell
below professional norms, Eberhard cannot prevail on this
claim because he has not shown prejudice.

First, as set forth below, if Eberhard's
sentencing counsel had objected or demanded an evidentiary
hearing prior to the sentencing, the record would have been
supplemented to include factual information concerning
specific additional individuals whom Eberhard supervised in
his criminal scheme and who in fact had pled guilty in the
Southern District of New York for that conduct.

Second, regardless of the additional information
that would have been added to the record, the record as it

19

existed at the time of sentencing supported imposition of
the four-level enhancement.   In his reconsideration motion,
Eberhard's counsel objected to the role enhancement.   On
reconsideration, the Court reached the merits of that
objection and rejected it based on the record as it existed
at the time of sentencing.   (A. 185-95.)   As set forth
below, that decision was supported by the record.   Any
objection counsel would have made prior to sentence would
have been rejected.   Accordingly, Eberhard cannot now show
that he was prejudiced by his counsel's failure to make
that objection prior to sentencing.[3]

Under the sentencing guidelines, the sentencing
court should increase a defendant's offense level by four
levels "[i]f the defendant was an organizer or leader of a
criminal activity that involved five or more participants
or was otherwise extensive."   U.S.S.G. § 3B1.1(a).

The leadership role enhancement is appropriate
where the defendant "played a crucial role in the planning,
coordination, and implementation of a criminal scheme."

---

[3]      Eberhard suggests that Bernstein should have investigated and
possibly demanded a hearing on whether the Government, either through
its case agent or otherwise, somehow breached its plea agreement
through its communications with the Probation Office.   (Eberhard Pet.
¶ 20.)   No evidence in this record shows that such a breach occurred.

United States v. Paccione, 202 F.3d 622, 624 (2d Cir.

2000). And so long as the criminal activity had five or

more participants or was "otherwise extensive," a defendant

may qualify for the four-level enhancement if he organized

or led at least one other participant. United States v.

Zichettello, 208 F.3d 72, 107 (2d Cir. 2000). Eberhard has

not challenged the finding that he was an "organizer or

leader" of criminal activity. Indeed, it was undisputed

that he was the founder of EIA and Park South, two of the

businesses through which he perpetrated the fraud, and that

by 1999 those businesses employed approximately 30 people.

(A. 98.)

A "participant" is a person "criminally

responsible for the commission of the offense." U.S.S.G.

§ 3B1.1, cmt. n.1. The defendant is counted as a

participant when calculating the number of participants

under Section 3B1.1. See Paccione, 202 F.3d at 625. In

considering whether an offense was "otherwise extensive,"

the court should ask "whether the criminal scheme was the

'functional equivalent' of a scheme involving five or more

knowing participants." United States v. Manas, 272 F.3d

159, 166 (2d Cir. 2001). In assessing functional

equivalence, a court should consider: "(i) the number of

21

knowing participants; (ii) the number of unknowing

participants whose activities were organized or led by the

defendant with specific criminal intent; [and] (iii) the

extent to which the services of the unknowing participants

were peculiar and necessary to the criminal scheme." Id.

(citing United States v. Carrozzella, 105 F.3d 796, 803-04

(2d Cir. 1997)); see also United States v. Bennett, 252

F.3d 559, 566 (2d Cir. 2001) (fraud involving the

"unknowing services of many outsiders" is otherwise

extensive).


The record at the time of sentencing showed that

the criminal activity Eberhard lead was "otherwise

extensive" under Section 3B1.1(a) and was "the functional

equivalent of a scheme involving five or more knowing

participants." Manas, 272 F.3d at 166; Carrozzella, 105

F.3d at 803-04. The PSR identified at least four

criminally responsible "participants" in Eberhard's fraud,

including Eberhard. (PSR ¶¶ 34, 38.) In addition, the PSR

established that Eberhard "organized" and directed many

additional employees and other individuals whose services

were "peculiar and necessary to the criminal scheme."

Carrozzella, 105 F.3d at 803-04. By 1999, Eberhard

employed at least 30 people at EIA and Park South.

22

Eberhard's fraud, which lasted from 1993 to 2003, touched
almost all aspects of those businesses.  (PSR ¶¶ 13-50).

The PSR also identified four individuals who
participated in Eberhard's obstruction of justice, to which
he pled guilty in this case, and which was closely related
to his larger fraud and was grouped with that conduct for
sentencing guidelines purposes.  (A. 174.)  Accordingly,
even assuming those additional individuals — Eberhard's
mother, a notary, and two former clients — are not
"criminally responsible" for Eberhard's obstruction of
justice, they nonetheless were organized by Eberhard and
their activities were necessary to his obstruction scheme.

Therefore, the record at the time of sentencing
established at least four "knowing participants" in
Eberhard's fraud and many more participants who acted at
his direction, including both employees at EIA and Park
South and others he used to obstruct justice.  The record
supported both the determination that this criminal
activity was "otherwise extensive" and the four-level
leadership role enhancement.  Accordingly, Eberhard cannot
show prejudice arising from his sentencing counsel's
conduct with respect to this enhancement.

**Information Not in the Record at the
Time of Sentencing Concerning Additional
Supervisees Bars Any Prejudice to Eberhard**

At the time of Eberhard's sentencing, the record
in his case did not contain information concerning Mary
Breakiron and John Heck, both of whom pled guilty to one
count of conspiracy to commit investment advisory fraud and
wire fraud and one count of investment advisor fraud
arising out of their participation in Eberhard's scheme.
The Informations filed against Breakiron and Heck
specifically identified Eberhard as their employer,
described their participation in Eberhard's scheme, and
discussed the manner in which Eberhard supervised their
participation. See Informations, Judgments and Docket
Sheets in United States v. Breakiron, 04 Cr. 209 (VM) and
United States v. Heck, 04 Cr. 71 (LAP).

Information regarding these two additional
participants in Eberhard's criminal scheme was not in the
record in this case at the time of Eberhard's sentencing.
If Eberhard's counsel had objected or demanded an
evidentiary hearing prior to the sentencing, however, the
record likely would have been supplemented to include facts

24

about Breakiron and Heck.   See Fed. R. Crim. P. 32(f)(3)

("After receiving objections, the probation officer may

meet with the parties to discuss the objections.   The

probation officer may then investigate further and revise

the presentence report as appropriate.").   Based on that

supplemented record, it would have been clear that

Eberhard's scheme involved at least five "criminally

responsible" participants.


         Therefore, Eberhard cannot now show that he was

prejudiced by his counsel's failure to object.


**Victim Statements**


         Eberhard has also contended that his counsel was

ineffective by failing to defend against victim statements

submitted at sentencing.   The victim statements described

conduct that Eberhard has never disputed and described the

enormous impact his theft had on the lives of his victims —

facts clearly beyond dispute.   In his Section 2255

petition, Eberhard does not dispute any of those victim

statements and does not even offer any argument that

counsel could have made to counter them.   Accordingly, he


25

cannot show that his counsel's response to the victim statements was ineffective or he was prejudiced thereby.

## Counsel's Conduct with Respect to the Guidelines and Sentences Imposed in Similar Cases Was Reasonable

Eberhard has also contended that his counsel was ineffective by failing to research and argue precedent on the impact of negotiated guidelines agreements and by failing to cite sentences imposed in similar cases. With respect to the impact of the plea agreement, while Eberhard criticizes the research of his sentencing counsel, he cites no research or precedent supporting his claim in the instant petition. Of course, a district court is "not bound by the [parties'] stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing." U.S.S.G. § 6B1.4(d); see United States v. Granik, 386 F.3d 404, 414 (2d Cir. 2004) ("[A] district court has power to reject a factual stipulation."). The plea agreement signed by Eberhard in this case, which stated that "neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to determinations of the proper Guidelines to apply to the facts," clearly alerted him to

26

this possibility.  (A. 56.)  Therefore, Eberhard has not
demonstrated ineffectiveness or prejudice on this issue.

        Eberhard also claims that his counsel was
ineffective by failing to argue for a lower sentence based
on sentences in similar cases, but cites no authority for
the proposition that failure to make such an argument
constitutes ineffective assistance.  Eberhard has not
established that his counsel fell below professional norms
or prejudiced Eberhard by failing to make this argument.
Counsel's conduct was effective and reasonable.

**Conclusion**

        Based upon the facts and conclusions set forth
above, the motion of Eberhard pursuant to 28 U.S.C. § 2255
to vacate his conviction and sentence is denied.

        It is so ordered.

**New York, NY**
**April  30, 2010**

**ROBERT W. SWEET**
**U.S.D.J.**

27